UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NITZA LOPEZ-LOPEZ,
     Plaintiff,


v.                                 CIVIL ACTION NO. 14-10063-MPK[1]


CAROLYN COLVIN, ACTING
COMMISSIONER OF THE
SOCIAL SECURITY
ADMINISTRATION,
     Defendant.


MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR ORDER
REVERSING DECISION OF THE COMMISSIONER (#16) AND
DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION (#24).

KELLEY, U.S.M.J.

## I. INTRODUCTION

Plaintiff Nitza Lopez-Lopez seeks reversal of the decision of Defendant Carolyn Colvin,

Acting Commissioner of the Social Security Administration ("SSA"), denying her Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (#16.) Defendant moves for

an Order affirming the Commissioner's decision. (#24.) With the administrative record having been

filed and the issues fully briefed (#16-1, #25), the cross motions stand ready for decision.

---

[1]

    With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (##20-23.)

## II. BACKGROUND

### A. Procedural History

Lopez applied for DIB and SSI on December 21, 2011. (TR[2] at 181-91.) She initially alleged that she became disabled on October 31, 2009, due to major depression with psychotic features and high blood pressure. (TR at 202.) She subsequently changed her onset of disability date to November 1, 2011. (TR at 28, 279.) Her applications were denied initially and upon reconsideration. (TR at 55-102.)

On July 2, 2013, a hearing was held before administrative law judge ("ALJ") Sean Teehan. (TR at 26.) At the hearing, Judge Teehan heard testimony from Lopez, who was sometimes assisted by a Spanish-English language interpreter, and Dr. James Cohen, Ph.D., a vocational expert. (TR at 16, 26-54.) On July 26, 2013, the ALJ issued an unfavorable decision. (TR at 13-25.) On November 12, 2013, the Appeals Council denied Lopez's request for review. (TR at 1-6.) With that, the ALJ's decision became final. *See Tefera v. Colvin*, 61 F. Supp. 3d 207, 2011 (D. Mass. 2014).

On January 9, 2014, having exhausted her administrative remedies, Lopez filed this action for review pursuant to 42 U.S.C. § 405(g). (#1.)

### B. Factual History

At the time of the administrative hearing, Lopez was fifty-two years old. (TR at 31.) She had been living in a shelter for the past eight months since moving out of her daughter's house. (TR at 38.) Lopez graduated from high school,[3] and also received training to be a receptionist. (TR at 31-

---

[2]

The designation "TR" refers to the Social Security administrative record.

[3]

In some parts of the record, it is reported that Lopez only completed school through the fourth grade. (*See*, *e.g.*, TR at 297.)

32.) Lopez had past relevant work experience as a receptionist, an accounting clerk, a sewing machine operator, and a customer service clerk. (TR at 32-35, 51.)

1. Medical Records

In this action, Plaintiff argues that the ALJ erred by failing properly to evaluate her mental impairments. (#16-1 at 5-7; TR at 30.) As a result, the Court need only focus on Lopez's mental health history.

Lopez's relevant medical history begins on December 8, 2009, when she went to the First Hospital Panamericano in her then-home of Puerto Rico complaining of "exacerbation of depressive symptoms -- audiovisual hallucinations, poor judgment, poor control, [and] agitation." (TR at 286.) She was admitted for "stabilization." (*Id*.) At the hospital, Lopez was treated with medications and individual and group therapy. (*Id*.) Lopez was discharged on December 16, 2009. (TR at 286-87.) At that time, she was tolerating her medications, and had responded appropriately to therapy. (TR at 286.) Upon discharge, Lopez was found to be alert and fully oriented; she had logical, coherent, and relevant thoughts; she maintained good hygiene and personal care; she had a euthymic mood and congruent affect; and she denied hallucinations, delirium, and suicidal/homicidal ideation. (TR at 287.) Lopez was diagnosed as suffering from "major depressive disorder, severe, recurrent, with psychosis"; "acute stressors: problems with her son, economical problems"; "long-term stressors: poor stress management skills"; and a Global Assessment of Functioning ("GAF") score of 60.[4] (*Id*.) She was prescribed medication, and it was recommended that she follow up with a psychiatrist. (*Id*.)

---

[4]     The Global Assessment of Functioning ("GAF") scale is used to rate a patient's "overall psychological functioning." American Psychiatric Institute, Diagnostic & Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed.1994). The scale goes from "1," indicating that the patient has a "persistent danger of severely hurting self or others," to "100," indicating "superior functioning." *Id*. A score in the range of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*. at 34.

On October 20, 2011, Plaintiff went to Bowdoin Street Health Center in Dorchester, Massachusetts, where she was seen by Janet Lincoln, a nurse practitioner. (TR at 349-50, 375.) Lincoln noted Plaintiff's "long extensive psyche history, including auditory hallucinations telling her to hurt herself and two attempts at suicide by medication overdose." (TR at 349.) She reported that Lopez denied current suicidal or homicidal thoughts. (*Id.*) Lincoln assessed that Lopez suffered from "depression/psychosis," as well as headaches which might be related to her psychiatric medications. (TR at 350-51.)

On October 26, 2011, Lopez was seen in Bowdoin's psychiatric division by Amy Brow, a licensed social worker. (*Id.*) Lopez reported to Brow "current depressed mood, poor sleep and appetite, fatigue, lack of motivation, and tearfulness," but no hallucinations or suicidal or homicidal thoughts. (*Id.*) Lopez also reported a significant family history of mental illness, including her mother and siblings who suffered from depression and a sister who has schizophrenia. (*Id.*) Brow diagnosed Lopez with "Major Depressive Disorder." (TR at 352.)

On November 1, 2011, Plaintiff underwent a psychiatric evaluation by Dr. Gabrielle Goldberger. (TR at 387-88.) Dr. Goldberger noted Plaintiff's history of major depressive disorder with psychotic features, hospitalizations, and suicidal thoughts. (TR at 387.) She also cited Lopez's childhood abuse, witnessing of her mother's abuse, and Lopez's abuse by her long-separated husband. (*Id.*) Lopez denied current psychotic symptoms and suicidal or homicidal thoughts. (*Id.*) Dr. Goldberger found that Lopez had good hygiene, was cooperative and spoke easily, had normal movement and good eye contact, appeared with a sad affect but responded to humor, was of average intelligence, had fair insight and judgment, and suffered from no gross neurological deficits. (*Id.*) Dr. Goldberger diagnosed Lopez as suffering from major depressive disorder, recurrent, moderate

to severe, with a history of psychotic features. (*Id.*) Plaintiff returned to Dr. Goldberger later that month. (TR at 354.) The doctor found that Plaintiff's mental status was "appropriate, coherent but also different from last visit," and that she seemed "slowed/sedated, [or possibly] overmedicated but does not report feeling any different from before." (*Id.*) Dr. Goldberger referred Plaintiff for "higher level care." (*Id.*)

On November 14, 2011, Lopez was seen again by Brow. (TR at 253.) Brow stated that Lopez "[p]resents with significant level of depression and functional impairment." (*Id.*) Brow referred Lopez to a partial hospitalization program. (*Id.*)

From December 2 to December 19, 2011, Lopez participated in a partial hospitalization program in the Arbour Health System. (TR at 291-305.)  She was treated by Dr. Anmir Agresar. (TR at 291.) Lopez's chief complaints were, "I feel so anxious and sad." (*Id.*) She reported that her move to Boston had lead to increased depression, anxiety, panic attacks, and paranoia. (TR at 302.) Lopez stated that she had previously been hospitalized four times, most recently in 2009. (TR at 292, 295-96, 302.) She also stated that she had attempted suicide twice by prescription drug overdose in 2004 and 2009, but denied current suicidal thoughts or drug use.[5] (*Id.*) It was determined that Lopez had only a limited understanding of her mental illness, but that her reliability as an informant about her symptoms was good. (TR at 297, 628.) Lopez also claimed to be in current compliance with her medication regimen. (TR at 292.) Based on these circumstances, and her history of major depression, Lopez was considered to be a "moderate" risk for suicide. (TR at 298.) Lopez also reported difficulty with concentration, information retention, sleep, and anxiety. (*Id.*) Dr. Agresar diagnosed

---

[5]

Medical records from her hospitalization in 2004 indicate that Lopez had been previously hospitalized "after presenting ... suicidal structured ideas to lacerate and self-mutilate her body, together with auditory hallucinations commanding her to harm herself." (TR at 532.)

her with major depressive disorder, recurrent, severe without psychotic features, and assessed her GAF as 40.[6] (TR at 301-02.) At discharge, he recommended that Lopez continue with medication and therapy. (TR at 302-03.)

After her discharge, Lopez began outpatient therapy with Francisco Matorras, M.A., who had treated her in the program. (TR at 324, 340-42, 346-47.) Lopez told Matorras that she was suffering from chronic depression which she attributed to her recent move to Boston from Puerto Rico, where she left family behind. (TR at 340.) She also showed symptoms of post-traumatic stress disorder ("PTSD") stemming from "[e]motional abuse and domestic violence experience and community violence related experiences," including "actual or threatened death or serious injury" by her father or husband, which "lead her to feel afraid, hopeless and depressed." (TR at 340-41.) Lopez also suffered from "excessive worrying," social withdrawal and isolation, sleep problems, noticeable fatigue, concentration problems, and "suicidal ideas." (TR at 324, 340.) Matorras noted that Lopez "has been hospitalized on a number of occasions," during which "[s]uicidal or self injurious behaviors were present." (TR at 340.) He diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic features, and rated her GAF at 52. (TR at 346.) He changed his diagnosis in his typewritten report to major depressive disorder, recurrent, moderate and PTSD. (TR at 341.) Matorras noted that Lopez's "[c]ognitive decline is a barrier to treatment success." (*Id*.) On December 29, 2011, Lopez denied "all psychiatric symptoms," but reported increased difficulty concentrating and thinking. (TR at 343.)

On January 3, 2012, Lopez returned to Bowdoin Street Health Clinic for a follow-up visit,

---

[6]

A GAF score in the 31–40 range "indicates [s]ome impairment in reality testing or communication ... [or] major impairment in reality testing or communication ... [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 32.

and she told Lincoln that she was "feeling much better." (TR at 355.) Lopez denied having any symptoms of depression or anxiety. (*Id*.) Lincoln reported that Lopez was alert, easily engaged, and smiled frequently. (*Id*.)

On January 5, 2012, Matorras reported that Lopez felt "anxious and with low energy," and was having trouble sleeping, but he found "no serious mental status abnormalities." (TR at 339.) On January 12, 2012, Matorras found her to be stable with no serious mental status abnormalities. (TR at 338.) During a January 26, 2012, appointment, Lopez "denied any anxiety symptoms," and stated that she was feeling happier because she was applying for independent housing, which would relieve some of the negative feelings she was having living with her daughter. (TR at 335.) However, she also reported sleep problems, excessive fatigue, memory problems, decreased sociability, sadness, and feelings of worthlessness. (*Id*.) Matorras reported that she was compliant with her medication regimen. (*Id*.) He diagnosed her with major depressive disorder, recurrent, moderate and PTSD. (*Id*.)

On January 31, 2012, Lopez returned to Lincoln for her yearly physical examination. (TR at 370.) Lincoln wrote that Lopez's depression was "[c]urrently stable," and that she was "smiling and pleasant, engaging in her healthcare." (TR at 371.) Lincoln counseled Lopez to continue taking her medications even if she felt better, "as that is what the medications are supposed to do." (*Id*.)

On February 8, 2012, Lopez had her first session with a group therapist, and soon after started therapy in a women's support group with Rebecca Abboud at Arbour Counseling. (TR at 331.) At a regular therapy appointment on February 9, 2012, Matorras wrote that Lopez was "feeling sad," was having difficulty with activities of daily living, and was dependent on her daughter. (TR at 330.) At the appointment, Matorras observed no signs of anxiety and found her memory and

orientation to be appropriate, but observed that Lopez had difficulty making decisions. (*Id.*) He diagnosed her with major depressive disorder, recurrent, moderate and PTSD. (*Id.*) On February 23, 2012, Lopez told Matorras that she had been sleeping well, was motivated to move to new housing, and was having a better relationship with her daughter and grandchildren. (TR at 323.)

On March 13, 2012, following an appointment, Dr. Goldberger sent Lopez to the emergency room at Beth Israel Deaconess Medical Center for a psychiatric evaluation because of a "concern for dissociation & anxiety," mental disorganization, and shakiness. (TR at 365-67.) Lopez was initially evaluated by Dr. Richard Klasco, who ruled out toxic or metabolic causes of her current mental status, and gave her provisional diagnoses of anxiety, depression, and psychosis. (TR at 367.) She was discharged the same day, with instructions from Dr. Louisa Canham to follow up with her therapist. (TR at 365.)

On March 14, 2012, Plaintiff followed-up with Matorras, and reported increasing levels anxiety and depression. (TR at 321.) Matorras observed that "[a]nxiety symptoms are present," "[s]leep problems have worsened," "[t]rembling and shaking associated with anxiety has worsened," and "[h]ypervigilance is still occurring." (*Id.*) He noted that Lopez was taking her medication regularly. (*Id.*) On April 4, 2012, Matorras found that Lopez's depressive episodes had worsened and become more frequent and intense; that her feelings of worthlessness continued; and that her difficulty sleeping had led to excessive fatigue. (TR at 318-19.) He commented that she had made no progress toward her therapeutic goals. (*Id.*) Matorras had her complete a Zung Depression Scale survey, on which Lopez "scored Severe Depression." (TR at 318.) He diagnosed her with major depressive disorder, recurrent, moderate and PTSD. (*Id.*)

On April 12, 2012, Matorras reported that Lopez's "symptoms have lessened in frequency

or intensity," although they were still present. (TR at 316.) On May 4, 2012, Matorras noted that Lopez's anxiety level had increased in frequency and intensity, and had resulted in motor restlessness and confusion. (TR at 313.) He also reported that Lopez continued to suffer from depression, that she had increasing difficulty with decision-making, and that her condition was getting worse overall. (TR at 313-14.) He reported that Lopez was having difficulty with her daughter and had moved out, and was currently living with a niece. (TR at 456-57.)

On May 17, 2012, Matorras found that Lopez's anxiety, depression, and concentration difficulties continued, but that she was less "sad," and was having "less difficulty making decisions." (TR at 310.) She continued to be anxious about her problems with her daughter, her financial situation, and the uncertainty of housing. (*Id.*) Matorras also counseled Plaintiff on her "lack of attendance to the sessions." (*Id.*) Matorras stated that her "medication compliance is good." (*Id.*) On May 25, 2012, Matorras noted that Plaintiff's "[b]ehavior has been stable and uneventful and medication compliance is good," but that her symptoms of depression and anxiety had not changed. (TR at 306.) He wrote that Lopez was having difficulty sleeping, had poor appetite, and was anxious at night. (*Id.*) He diagnosed her with major depressive disorder, recurrent, moderate, and PTSD. (*Id.*)

On June 7, 2012, Dr. Goldberger examined her. (TR at 383.) The doctor reported that Lopez was sad and had slow speech, but was "overall appropriate, coherent, [and] well kempt." (*Id.*) Lopez denied mood changes, suicidal or homicidal thoughts, and auditory or visual hallucinations. (*Id.*) Lopez reported having been off of her medication for a week because she could not afford it, and Dr. Goldberger discussed options for her, including pharmacies that will defer co-pays. (*Id.*) Dr. Goldberger continued her on medications, but reduced the strength of the Paxil prescription because Lopez reported "too much sedation." (*Id.*)

On June 19, 2012, Dr. Byron Garcia, a psychiatrist, examined Lopez. (TR at 468-70.) She "present[ed] with depressive and PTSD symptoms." (TR at 469.) Dr. Garcia noted "no gross abnormalities" in her mental status. (*Id*.) Dr. Garcia diagnosed Lopez with major depressive disorder, recurrent, moderate and PTSD, and gave her a GAF score of 50.[7] (*Id*.)

On June 22, 2012, Matorras rated Lopez's current risk of suicide as "very low or absent." (TR at 471.) Over the next two months, Matorras continued to rate Plaintiff's GAF as 50. (TR at 428, 471, 474, 475, 478, 480.) On August 8, 2012, Matorras noted that Lopez's anxiety was "an active problem in need of treatment," and that it "primarily manifested by: panic attacks--which occur more frequently in certain situations." (TR at 853.) On August 17, 2012, Lopez reported improving anxiety symptoms, but daily depressive symptoms, difficulty making decisions, excessive worrying, excessive fatigue, and social difficulties. (TR at 716.)

On August 31, 2012, Matorras found that Plaintiff's symptoms had worsened, that she was experiencing auditory hallucinations, and that her risk of suicide was "medium." (TR at 481.) He sent her to the Arbour Health System for treatment and hospitalization, where she stayed until September 12, 2012. (TR at 678, 691.) At the hospital, Lopez was treated by Dr. Agresar. (TR at 676.) Lopez reported increased psychiatric symptoms due to personal stressors, problems sleeping, and hearing voices calling her name. (*Id*.) She also claimed to have "passive" suicidal thoughts of "not having desire to live" approximately once per day. (TR at 682, 685.) Dr. Agresar diagnosed her with major depressive disorder, recurrent, severe with psychotic features and PTSD, and gave her a GAF score of 38. (TR at 680-81, 690.) He also opined that Lopez "seems to be exaggerating

---

[7]

A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. at 34.

symptoms as she presents more anxious individually than seen out in brakes [sic] when she is in the program." (TR at 678, 690-91.) Dr. Agresar also reported that "only a few medication[s] were started given her non-compliance [history]," and that after a few sessions, she "stopped showing up" for group therapy. (TR at 678.) Upon discharge, Lopez was noted to be depressed and mildly anxious, with impaired concentration, but to have normal speech and thought processes; no signs of psychosis; intact memory, abstract reasoning, and executive functioning; fair judgment; and no suicidality. (TR at 679.) Dr. Agresar prescribed medication and continued therapy. (TR at 700.)

On September 12, 2012, Lopez requested an emergency session with Matorras because she was experiencing high anxiety, overdose of anxiety medication, and dizziness and concentration problems, likely prompted by an argument with her daughter and a need for new housing. (TR at 484.) At the appointment, she told Matorras that her anxiety, confusion, concentration problems, insomnia, depression, worrying, and fatigue were worsening overall. (*Id*.) Matorras gave her advice on her housing situation. (*Id*.) He rated her GAF at 50. (TR at 485.)

On September 15, 2012, Dr. Garcia examined Plaintiff and noted "no serious mental abnormalities," and that "[n]either depression nor mood elevation is evident." (TR at 487.) He rated her risk of suicide as "low." (*Id*.) Dr. Garcia gave her a GAF score of 50. (*Id*.)

On September 24, 2012, Matorras reported that Lopez's depressive symptoms continued but had lessened in frequency and intensity, as she had been staying alternately at a women's shelter and with her sister. (TR at 489.) He gave her a GAF score of 50. (*Id*.) On October 12, 2012, Matorras noted that Lopez's anxiety had improved, and that she had not reported depressive symptoms. (TR at 491.) He again gave her a GAF score of 50. (*Id*.) At an appointment on November 6, 2012, Matorras noted that Lopez's anxiety had increased, and that she had recently gone to the emergency

room after suffering from a panic attack. (TR at 885-86.) Through the rest of November, Lopez reported improving depression and anxiety, and Matorras continued to rate her GAF as 50. (TR at 432, 437, 478.)

On November 10, 2012, Lopez was examined by Dr. Garcia. (TR at 496.) Dr. Garcia reported that Lopez "appears glum, minimally communicative, tense, casually groomed, and tense," and showed "signs of anxiety." (*Id*.) He prescribed medication. (*Id*.) On December 8, 2012, Dr. Garcia again examined Lopez. (TR at 508.) Lopez reported severe anxiety, and Dr. Garcia noted that she had an "[a]nxious mood and affect" and "chronic maladaptive behaviors." (*Id*.) At both appointments, Dr. Garcia rated her GAF as 50. (TR at 496, 508.)

On December 11, 2012, Matorras found that Plaintiff's depressive symptoms had worsened and were more intense. (TR at 510.) Lopez reported a recent panic attack as well as "hearing voices that call[] her at night." (*Id*.) Matorras found that Lopez had a "medium" risk of suicide, exacerbated by "[a] major depression"; "feelings of hopelessness, worthlessness, or guilt"; and a weakening of her support system. (*Id*.) Matorras gave her a GAF score of 50. (*Id*.) On December 21, 2012, Matorras reported that Lopez had a "depressed mood" and anxiety, and rated her GAF as 50. (TR at 442.)

From December 24, 2012, through January 10, 2013, Plaintiff attended a treatment and partial hospitalization program in the Arbour Health System. (TR at 746-47.) On admission, she complained of increased panic attacks accompanied by heart palpitations, chest pain, shortness of breath, sweating, and trembling in one leg. (*Id*.) Lopez reported that she was experiencing similar symptoms once or twice per week, but that Ativan had helped. (*Id*.) She told Dr. Catalina Melo, the attending psychiatrist, that she does not always take her medication, but might take it only "when

she is not feeling well." (*Id*.) A mental status examination revealed a "clearly anxious" affect and poor insight, but no other mental deficits. (TR at 748-49.) Dr. Melo diagnosed her with "[a]nxiety NOS, r/o panic disorder," instructed her to take medication as prescribed, and recommended that she follow up with Dr. Garcia. (TR at 748.)

On January 10, 2013, Matorras referred Lopez for hospital admission due to increased depression and anxiety with psychotic symptoms. (TR at 753.) Lopez described having recent, worsened anxiety attacks, hearing voices calling her name, and seeing shadows. (*Id*.) Dr. Agresar examined her and found her to have a depressed affect and mood, general anxiety, impaired concentration, and fair judgment, and to be at "moderate" risk for suicide. (TR at 753-54, 781.) He diagnosed her as suffering from major depressive disorder, recurrent, severe with psychotic features and anxiety disorder NOS, and rated her GAF as 38. (TR at 755.) Dr. Agresar prescribed a change in medication and continued therapy. (TR at 753-55.) Lopez left the hospital before she could be formally discharged.[8]  (TR at 754-55, 785.)

On January 26, 2013, Lopez was evaluated by Dr. Garcia. (TR at 515-17.) She reported anxiety as well as three to four panic attacks per week, each lasting forty-five minutes to an hour. (TR at 515.) She described the panic attacks as "[a] sensation of impending doom, increased heart rate, body tremor and shortness of breath." (TR at 515.) Lopez also claimed to experience "vague auditory hallucinations," such as "[a] voice calling [her] name." (*Id*.) Dr. Garcia diagnosed her with major depressive disorder, recurrent, moderate and PTSD, and gave her a GAF score of 50. (TR at 515-16.)

---

[8]

The record shows that Plaintiff failed to show or cancelled many appointments with mental health providers. (*See, e.g*., TR at 312, 320, 329, 459, 483, 525, 712, 887.)

13

On January 31, 2013, Lopez told Matorras that she had been experiencing worsened anxiety and continuing panic attacks, but she denied suicidal thoughts or psychosis. (TR at 518.) She also denied symptoms of depression. (*Id.*) Matorras gave her a GAF score of 50. (TR at 519.)

On February 15, 2013, Dr. Garcia examined Lopez, and found that she was "stable and doing fine," "denie[d] feeling anxious or depressed," and had no manic or psychotic symptoms. (TR at 840.) He gave her a GAF of 50. (*Id.*)

On February 26, 2013, Lopez told Matorras that she felt less anxious and depressed. (TR at 526.) She stated that a new medication was helping her. (*Id.*) Matorras found that Lopez was still suffering from depression and anxiety. (*Id.*) On March 12, 2013, Lopez reported feeling anxious and depressed. (TR at 528.) She described dizziness, chest pain, trouble breathing, panic attacks, sadness, difficulty thinking and concentrating, and decreased sociability. (*Id.*) He rated her GAF at 50. (TR at 529.) On April 4, 2013, Plaintiff reported feeling depressed and anxious, which she attributed to the fact that she had been homeless for more than seven months, and the fact that her grandchild was removed from her daughter's home. (TR at 824.) Lopez described feelings of disorientation, memory and concentration problems, trouble sleeping, and occasional panic attacks. (*Id.*) Approximately one week later, Matorras found Lopez to be "upbeat and future oriented," with no signs or symptoms of anxiety or depression. (TR at 822.) Lopez returned on April 25, 2013, complaining of anxiety and depression which she attributed to her unresolved housing situation as well as lingering fear from the recent Boston Marathon bombing. (TR at 819, 821.) On May 9, 2013, Plaintiff reported that she was feeling better, but still had feelings of anxiety and depression. (TR at 817.) On May 28, 2013, Lopez reported that she had been feeling anxious, particularly when she is around "too many people or when she is on the train." (TR at 814.) On June 11, 2013, Lopez

reported that she felt depressed, and that she was suffering from weekly panic attacks, likely due to her housing situation and financial problems. (TR at 812.) Matorras gave her a GAF score of 50. (TR at 813.)

## 2. Medical Opinions

On January 31, 2012, Dr. Carol McKenna, a psychologist, evaluated Lopez's condition and residual functional capacity ("RFC")[9] based on the medical records on behalf of the state. (TR at 60.) Dr. McKenna reported that Lopez had symptoms of depression, which had resulted in a mild restriction of activities of daily living; mild problems maintaining social functions; moderate restrictions in maintaining concentration, persistence, or pace; and one-to-two episodes of decompensation. (TR at 60-61, 70-71.) Dr. McKenna stated that, with appropriate treatment, Lopez could sustain attention and concentration in two-hour increments during a full work week, and adapt to typical workplace changes after a brief period of adjustment. (TR at 61-63, 71-73.) On July 18, 2012, Lisa Fitzpatrick, Psy.D., reviewed and concurred with Dr. McKenna's findings. (TR at 83-86, 95-98.)

On September 21, 2012, Matorras completed a Mental Impairment Questionnaire for purposes of Plaintiff's applications for disability benefits. (TR at 398-401.) Matorras reported that Lopez suffers from the following: depression and anxiety; poor memory, appetite, and sleep patterns; mood disturbance; emotional lability; anhedonia; feelings of guilt/worthlessness; difficulty thinking or concentrating; "[o]ddities of thought, perception, speech, or behavior"; time or place

---

[9]

A Social Security claimant's residual functional capacity is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular continuing basis," despite mental and physical limitations. Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996); *see* 20 C.F.R. §§ 416.920(e), 416.945, 404.1545(a)(1).

distortion; social withdrawal or isolation; blunt or inappropriate affect; decreased energy; and pathological dependence or passivity. (TR at 398.) Matorras found that Plaintiff's mental condition caused marked limitations with regard to activities of daily living; maintaining social functioning; and concentration, persistence or pace ("resulting in failure to complete tasks in a timely manner"). (TR at 400.) He also reported that Plaintiff had experienced "three or more" episodes of decompensation in work or work-like settings in a one-year period. (*Id.*) Matorras stated that Lopez's impairments were consistent with the symptoms and limitations noted in the evaluation. (TR at 399.) He also stated that Lopez's symptoms could be expected to last for at least twelve months. (*Id.*) On March 12, 2013, Matorras updated his answers to include a new list of Lopez's medications, and both he and Dr. Garcia signed the questionnaire, adopting Matorras's findings. (TR at 809-11.)

On November 9, 2012, Dr. Raman Gill Chahal, a state agency psychiatrist, completed a case analysis, RFC assessment, and Psychiatric Review Technique form ("PRTF") based on his review of the medical record. (TR at 403-22.) Dr. Chahal found that Lopez suffered from major depressive disorder, recurrent, at a level that qualifies as a "severe impairment" but "not of listing level." (TR at 404.) In the PRTF, Dr. Chahal considered only Listing 12.04, for affective disorders. (TR at 405.) He found that Plaintiff's depression caused only a mild restriction of her activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (TR at 415.) He also determined that Lopez had experienced only one or two "[e]pisodes of decompensation, each of extended duration." (*Id.*) In his Mental RFC assessment, Dr. Chahal found Lopez to be only moderately limited in her ability to understand, remember, and carry out detailed instructions; to "maintain attention and concentration for extended periods"; to "perform

activities within a schedule, maintain regular attendance, and be punctual"; and to "complete a normal workday and workweek without interruptions from psychologically based  symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (TR at 419-20.) Dr. Chahal also found her to be moderately limited in her ability to "interact appropriately with the general public," and in her ability to "respond appropriately to changes in the work setting." (TR at 420.) Dr. Chahal concluded that Lopez's "mental allegations are pertially [sic] credible," but that the symptoms and limitations that she reported were not entirely consistent with the medical records. (TR at 404.)

On January 26, 2013, Dr. Garcia examined Lopez and completed a questionnaire about her mental health at the request of the Massachusetts Department of Transitional Assistance. (TR at 803-07.) Dr. Garcia wrote that Lopez was currently showing the following clinical signs and symptoms: low energy, sleep problems, panic attacks, hopelessness, and concentration problems. (TR at 803.) He reported that she appeared "physically unkempt," was "frequent[ly] date and place disoriented," had a worried affect, slow speech, and concentration and memory problems. (*Id*.) He  stated that impairments that might affect Lopez's ability to work included concentration and memory problems, sleeping problems, panic attacks, depression, low energy, hopelessness, and passive suicidal ideations. (TR at 805.) Dr. Garcia reported that Plaintiff's mental health condition negatively affected her ability to do ordinary housework, driving, managing medications, general organization, and visiting family or friends. (*Id*.) The doctor stated that Lopez's impairments affect her ability to work, and that they were expected to last more than one year. (TR at 806.)

### 3. Hearing Testimony

At the administrative hearing, Lopez testified that she came to the mainland United States

from Puerto Rico with her daughter to help take care of her daughter's four children.[10] (TR at 37-38.) She testified that she lived with her daughter at first, but eventually moved out because she and her daughter were not getting along well. (TR at 37-39.) Lopez stated that she now lived in a shelter, and had submitted an application for more permanent housing. (TR at 38-39, 42.) She testified that she has a niece with whom she stayed for three weeks, but that they no longer get along. (TR at 43.) She stated that she also has a sister who lives in the area. (*Id.*)

Lopez described a typical day as waking up at 4:00 a.m., and then sitting in the shelter living room until 6:00 a.m., when it was time for breakfast. (TR at 39-41.) She told the ALJ that she would then "go out to do [her] things," such as go to appointments, shop for groceries, or walk in the park. (*Id.*) She stated that she typically uses public transportation to travel, but sometimes walks or gets a ride. (TR at 39-41.) Lopez testified that, for leisure, she might read the Bible or watch television. (TR at 45.) She also stated that, when she lived with her daughter, she went to three-hour services at church on Sundays, but that she had not found a church she liked since moving to the shelter. (TR at 44.) Lopez testified that she eats her meals at the shelter, preparing her own in the communal kitchen with the items that she buys at the store. (TR at 46.)

Lopez testified that from 2000 through 2009, she worked as a receptionist for a furniture store, primarily answering the telephone for customer service calls.[11] (TR at 33-34.) She stated that she left that job because she was suffering from severe anxiety for which she took medication and was at one point hospitalized. (TR at 34.)

---

[10]

At the hearing, Lopez testified that she did not recall when she moved from Puerto Rico, but the record shows that she made the move around September 2011. (*See*, e.g., TR at 340, 349.)

[11]

At this part of the transcript, the ALJ stated that Lopez had that job from 2000-2010, but that appears to be an error. (TR at 33.)

Lopez told the ALJ that she is disabled and incapable of performing work because of depression, anxiety, and panic attacks. (TR at 36.) She testified that she suffers from frequent depressive episodes, that leave her "[s]ad, without energy, and [with] no motivation." (TR at 47.) She also testified that she suffers from panic attacks once a week and that they last approximately 45 minutes. (TR at 36, 47.) She described the panic attacks as follows:

> When I'm going to have an attack, I feel tightness in my chest. I feel that I'm having a hard time breathing. I feel that I'm going to die. As I was dying [sic] I just feel awful.

(TR at 48.) She explained that she sometimes went to the emergency room when having a panic attack because "they hit me hard and I cannot control it." (*Id.*) Lopez stated that, when having an episode of depression or anxiety, she does not feel that she can do anything other than retreat to her room to lie down, and cannot even watch television. (TR at 47-49.) Lopez told the ALJ that she is unable to anticipate whether she is going to suffer from a depressive or anxious episode. (TR at 48-49.) She stated that "[t]here are days I feel okay, but there are so many days that I don't feel okay." (TR at 49.)

Lopez stated that she takes medication daily for panic attacks, and said that it helps her, although it does not "cure [her]." (TR at 36-37.) Lopez testified that her depression affects her on a day-to-day basis "because [she is] not the same person as [she] used to be." (TR at 37.) She stated that she takes medication for depression, as well, and also attends therapy once every one-to-two weeks. (*Id.*) She told the ALJ that the anti-depressant medications also help, but do not "cure" her. (*Id.*) She stated that the therapy helps, as well. (*Id.*)

The vocational expert, Dr. James Cohen, also testified at the hearing. (TR at 50-54.) Dr. Cohen identified Plaintiff's past relevant work as a receptionist as semi-skilled, sedentary work; her

work as an accounting clerk as skilled, sedentary work; her work as a sewing machine operator as

skilled, light work; and her work as a customer service clerk as semi-skilled, light work. (TR at 51.)

The ALJ asked Dr. Cohen the following hypothetical question:

Q  ... Now, assume, if you will that a hypothetical person is of the same age, education, language, and work background as the claimant. Further assume that, that if there is work that such a person could perform it would be subject to the following limitations. This person would have no exertional level, however, would have the following nonexertional limitations. This person would be able to understand and carry out two- to three-step tasks and would be able to maintain concentration, persistence, and pace in the performance of these tasks for two-hour increments over an eight-hour workday over a 40-hour workweek. This person would be able to relate to coworkers and supervisors on a superficial basis and would be able to have occasional superficial interaction with the general public. This person would be able to deal with minor changes in the work place. Would such a person be able to perform any of the past work of the claimant?

A  She would be able to be a receptionist and she could also be a customer service clerk. It would be my professional [sic] that she could also be the sewing machine operator, however, it may be more complex than two or three steps. Most -- I mean she indicated that she was making part of a bra, not the entire bra so I, I would say that would fall under two to three steps so those three jobs.

Q  So the sewing machine operator as performed?

A  Correct.

(TR at 52-53.) The ALJ then posed another hypothetical:

Q  Now, assume, if you will, that our second hypothetical person is a -- has the following limitations. This person -- okay. This person would have marked limitations in maintaining social functioning as well as maintaining concentration, persistence, and pace, and also in activities of daily living. For purposes of this functional capacity assessment marked means more than moderate but less than extreme. A marked limitation may arise when several activities of [sic] functions are impaired or even when only one is impaired so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, and effectively in that category. Would such a person be able to perform any work in the regional or national economy?

A  No.

(TR at 53.)

Plaintiff's attorney also asked the vocational expert a hypothetical question, as follows:

> Q If you could presume in the first hypothetical that the person would be limited to superficial interaction with coworkers and the public, minor changes in the work setting, but such a person would be unable to maintain attention and concentration for up to two periods -- two hours at a time throughout the workday in the course of doing simple and unskilled work. What effect would that have on the jobs you described?

> A  That person would not be able to work.

(*Id.*) The attorney also asked Dr. Cohen:

> Q  Okay. And if such a person limited to the simple, unskilled level were to experience over the course of the year an absentee rate of approximately 12 to 24 absences from the workplace, what effect would that have on the available jobs?

> A  They would not have an opportunity to work.

(*Id*. at 54.)

With that, the ALJ concluded the hearing. (*Id*.)

### III. <u>THE STANDARD OF REVIEW</u>

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Secretary of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996); *see Reyes Robles v. Finch*, 409 F.2d 84, 86 (1st Cir. 1969) (holding that "as to the scope of court review, 'substantial evidence' is a stringent limitation").

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Irlanda Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. *See Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

Finally it has been noted that,

> Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Sec'y of Health & Human Servs.*, 835 F.2d 937, 939 (1st Cir. 1987) (per curiam) (citing *Thompson v. Harris*, 504 F. Supp. 653, 654 [D. Mass.1980]), and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts,' *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

*Musto v. Halter*, 135 F. Supp. 2d 220, 225 (D. Mass. 2001).

## IV. DISCUSSION

In order to qualify for either DIB or SSI, a claimant must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

In this case, in determining Lopez's eligibility for benefits, the ALJ conducted the familiar five step evaluation process to determine whether an adult is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982); *Veiga v. Colvin*, 5 F. Supp. 3d 169, 175 (D. Mass. 2014). At the first step, the ALJ found that Lopez had "not engaged in substantial gainful activity since November 1, 2011, the alleged onset date [of disability]." (TR at 18.) At the second, he found that Lopez suffered from the following medically determinable impairments--"anxiety disorder and depressive disorder"--and that both of these impairments are "severe." (TR at 19-22.) At step three, the ALJ determined that Lopez "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (TR at 22-23.) For this step, the ALJ considered Listing 12.04, for affective disorders, and Listing 12.06, for anxiety-related disorders. (*Id.*) At the fourth step, the ALJ found that Lopez has the following RFC:

> I find that the claimant has the residual functional capacity to perform a full range
> of work at all exertional levels but with the following nonexertional limitations: she
> could maintain concentration, persistence or pace for two hour increments during an
> eight hour workday and 40 hour workweek, she could understand and carry out two
> to three step tasks, she could have superficial and occasional interaction with
> coworkers and supervisors, she could have occasional and superficial interaction
> with the general public, and she could deal with minor changes in the workplace.

(TR at 23-25.) And at the fifth step, the ALJ considered Lopez's RFC, age, education, and relevant

work experience, and the testimony at the hearing, and determined that Lopez "is capable of

performing past relevant work as a receptionist, sewing machine operator and customer service

clerk." (TR at 25.) After making these findings, the ALJ concluded that Lopez "has not been under

a disability, as defined in the Social Security Act, from November 1, 2011, through the date of this

decision," and he denied her applications for benefits. (*Id.*)

In her motion, Plaintiff argues that the ALJ erred by failing properly to consider her GAF

scores from December 2011 to April 2013. (#16-1 at 4-7.) She also complains that the ALJ failed

to take into consideration "the assessments of a Social Security evaluator who opines that [t]he

claimant suffers marked limitations in the occupational domain of concentration, persistence and

pace." (*Id.* at 7.) Finally, she claims that the ALJ erred because he did not "address uncontroverted

evidence that plaintiff would be expected to miss time from work due to her medical condition."

(*Id.*)

### A.  Global Assessment of Functioning Scores

Plaintiff first contends that the ALJ erred because he either failed to address or improperly

rejected the findings of Dr. Agresar, Dr. Garcia, and Matorras as to her GAF score.  (TR at 4-7.)

From December 2011 through April 2013, Lopez was given a GAF score of 50 or below at least

twenty times, all by doctors or therapists who repeatedly examined and treated her. (*See id.* at 5-6.)

A "50"on the GAF scale indicates that the patient suffers from "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Institute, Diagnostic & Statistical Manual of Mental Disorders ("DSM–IV") 34 (4th ed.1994). In December 2011, Dr. Agresar found that Lopez had a GAF of 40, and in January 2013, found it to have dropped again, to 38. (TR at 301-02, 755.) Those scores indicate "[s]ome impairment in reality testing or communication ... [or] major impairment in reality testing or communication ... [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 32. In his decision, the ALJ acknowledged the score of 38, as well as a score of 60 that was given to her in 2009, well before she applied for benefits. (TR at 19.) He makes no mention, however, of the fact that numerous scores of 50 were given to Plaintiff over the relevant time period.

Defendant argues that this was not in error because the GAF scale is not part of the DSM-V, the newest edition of the manual, published in May 2013. (#25 at 14-17.) Defendant also claims that "[i]t appears that the GAF scores remained constant because Mr. Matorras and Dr. Garcia did not update the pertinent section of their progress notes." (*Id*.) Defendant further claims that the ALJ did not err because the scores appear to be inconsistent with some of the objective findings in the same records. (*Id*.)

Defendant is correct that the GAF scale was not included in the most recent version of the DSM. *See King v. Colvin*, No. Civ. A. 14-10380-ADB, 2015 WL 531589, at *14 (D. Mass. Sept. 11, 2015) ("Indeed, the American Psychiatric Association has moved away from the GAF system in recent years"); *Mendes v. Colvin,* No. Civ. A. 14-12237-DJC, 2015 WL 5305232, at *8 (D. Mass. Sept. 10, 2015). However, "the Social Security Administration ... has indicated that it will continue

to receive into evidence and consider GAF scores." *Blais-Peck v. Colvin*, No. Civ. A. 14-cv-30084-KAR, 2015 WL 4692456, at *n.3 (D. Mass. Aug. 6, 2015) (citing SSA Administrative Memorandum 13066 (July 22, 2013)). Further, courts have not disavowed the GAF scale as a measurement of one's mental capacity: "Although ALJs 'cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation,' they can continue to 'consider GAF scores just as [they] would other opinion evidence, [although] scores must have supporting evidence to be given significant weight.'" *Mendes*, 2015 WL 5305232, at *8 (quoting *Bourinot v. Colvin*, No. 14-cv-40016-TSH, 2015 WL 1456183, at *13-14 (D. Mass. Mar. 30, 2015)); *see King*, 2015 WL 531589, at *14. Moreover, the GAF scale was in effect at the time that Plaintiff's caregivers used it as a means to define her mental limitations. *See Mendes*, 2015 WL 5305232, at *8. Finally, it is well settled that:

> Treating physicians' opinions are ordinarily accorded deference in Social Security disability proceeding[s], *Richards v. Hewlett–Packard Corp*., 592 F.3d 232, 240 n. 9 (1st Cir. 2010), because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*King*, 2015 WL 5315189, at *14 (citing 20 C.F.R. § 416.927(c)(2)) (internal quotation marks omitted). "Thus, a treating-source opinion is entitled to controlling weight, if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Id*. (quoting 20 C.F.R. § 416.927(c)(2)). If the ALJ does not give controlling weight to a treating source opinion,

the ALJ considers an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)-(6);

416.927(c)(2)-(6). Further, the regulations require adjudicators to explain the weight given to a treating source opinion and the reasons supporting that decision. *See* 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

*Bourinot*, 2015 WL 1456183, at *11-12; *see Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass. 2007); *Walker v. Barnhart*, No. Civ. A. 04-11752-DPW, 2005 WL 2323169, at *18 (D. Mass. Aug. 23, 2005) (The ALJ must "accept[] or explicitly discredit[]...the record evidence from [the claimant] and her treating physician"). Here, the ALJ should have considered all of the evidence, and given specific reasons when rejecting the opinions of the treating sources.[12] The fact that he did not constitutes reversible error.

Defendant also speculates that Matorras and Dr. Garcia may simply not have updated their progress report form to reflect a change in GAF score, and argues that the scores appear to be inconsistent with other findings in those reports. (#25 at 14-17.) Defendant claims, in particular, that some reports by Matorras and Dr. Garcia state that Lopez's GAF is 50 while also finding that she had no objective signs of anxiety or no mental abnormalities.[13] (*Id*. at 15-16.) Instead of supporting Defendant's argument, however, these claims demonstrate the need for further development of the record. An ALJ "has a 'duty to develop an adequate record from which a reasonable conclusion can

---

[12]

Importantly, in this case, the ALJ afforded Dr. Garcia's report and mental impairment questionnaire "little evidentiary weight" because "Dr. Garcia's conclusions are inconsistent with the medical evidence of record when view[ed] in its entirety." (TR at 24.) The ALJ offered no specific examples or evidence from the record demonstrating the purported inconsistencies. *See, e.g.*, *Bourinot v. Colvin*, No. 14-cv-40016-TSH, 2015 WL 1456183, at *13 (D. Mass. Mar. 30, 2015) ("The ALJ provided specific reasons, supported by evidence in the case record, for his decision to discount each of the opinions of Dr. Anderson, Dr. Burns, and Dr. Vogel. The reasoning is sufficiently specific to inform both the claimant and this reviewing Court of how each treating source opinion was evaluated"). Given that a treating physician's opinion is generally afforded considerable deference, relying on a sweeping statement alone simply is an insufficient basis upon which to devalue Dr. Garcia's opinion.

[13]

The first of the reports Defendant cites in support of this argument is Dr. Garcia's from January 26, 2013. (TR at 515-17 [duplicated at TR 849].) Contrary to Defendant's claim, in that record, Dr. Garcia stated that Lopez "appear[ed] anxious" and showed "signs of anxiety," and also that she reported hallucinations. (*Id*.)

be drawn.'" *King*, 2015 WL 5315189, at *11 (quoting *Heggarty v. Sullivan*, 947 F.2d 990, 997 (1st Cir. 1991)). Accordingly, "'[i]f the evidence does not support a source's opinion and the ALJ cannot ascertain the basis for the source's opinion, the ALJ has an obligation to "make every reasonable effort" to recontact the source for clarification.'" *Id*. at *12 (quoting *Gaeta v. Barnhart*, No. Civ. A. 06-10500-DPW, 2009 WL 2487862, at *5 (D. Mass. Aug. 13, 2009) (quoting SSR 96–5P, 1996 WL 374183, at *6 (July 2, 1996))). "Specifically, the ALJ must recontact the treating doctor when the doctor's records are inadequate, contain conflict or ambiguity, do not appear to be based on medically acceptable diagnostic techniques, or appear incomplete." *Id*. (citations and internal quotation marks omitted). "'The ALJ may carry out this duty by seeking additional evidence or clarification from the source, telephoning the medical provider, or requesting copies of the records, a new report, or more detailed report.'" *Id*. (quoting *Gaeta*, 2009 WL 2487862, at *5).

In this case, the ALJ should have sought clarification before rejecting the GAF findings of Lopez's treating sources. *See id*. The failure is particularly problematic here, where Lopez's GAF score was repeatedly and consistently found to be 50 or below, and there was significant evidence that Lopez suffered from a number of serious mental health problems. The ALJ may ask, for instance, why Dr. Agresar gave Lopez a GAF score of 38 while in the same report stating that she appeared to be exaggerating her symptoms. (*See* TR at 678, 690-91.) Also, the ALJ can inquire as to whether Dr. Garcia and Matorras intended to give Lopez so many GAF scores of 50, or merely, as Defendant posits, neglected to erase the entry from the form. Further, the ALJ should ask the sources to provide explanations for seemingly inconsistent or unsupported findings. Only when the record is fully developed can the ALJ can make a decision that is supported by substantial evidence.

B.  Worksheet

Lopez also argues that the ALJ erred because he failed to discuss "the assessments of a Social Security evaluator who opines that [t]he claimant suffers marked limitations in the occupational domain of concentration, persistence, and pace." (#16-1 at 7 [citing TR at 265-68].) The assessment in question is titled "IR Special Project Case Analysis Worksheet," and appears to be an internal SSA summary of some of Plaintiff's medical history that was forwarded to Dr. Chahal for use in his state-ordered assessments. (*See* TR at 265-68, 403-04.) The name of the evaluator is not given. Plaintiff makes no effort to identify this document. She also cites no authority requiring an ALJ to consider an unsigned, internal SSA worksheet from an unknown evaluator. Further, she fails to show that the worksheet is, in fact, an opinion that should be reviewed along with other medical records. Moreover, the ALJ addressed the assessments by Dr. Chahal, who considered the worksheet. (*See* TR at 19-25, 403-04.) Under these circumstances, Plaintiff has not shown that the ALJ committed an error by not addressing the assessments made in the evaluation, and the case need not be remanded on this issue.

## C.  Uncontroverted Evidence

Lopez further argues that the ALJ should have "address[ed] uncontroverted evidence that [she] would be expected to miss time from work due to her medical condition." (#16-1 at 7.) Specifically, she points out that "[t]he ALJ concedes that the claimant experienced two psychiatric breaks and episodes of decompensation during the period of alleged disability." (*Id.* [citing TR at 23].) She further notes that the record contains evidence that she "underwent three psychiatric hospitalizations during the period of alleged disability..., as well as several emergency room treatments." (*Id.* at 8 [citing TR at 305, 690, 755].) Plaintiff argues that this evidence is uncontroverted and that it supports a finding that she may face "excessive absenteeism from the

workplace." (*Id*.) Defendant did not rebut these arguments.

As detailed above, an ALJ has a duty to consider the findings and opinions of treating sources "by either accepting or explicitly discrediting [them]." *Walker*, 2005 WL 2323169, at *18 ("[t]he ALJ erred by failing to consider [the evidence] regarding how frequently she could be expected to miss work due to [her impairment] when reaching his determination of her RFC"). In this case, not only was there evidence from treating sources that goes to the issue of absenteeism, but the vocational expert testified that a person who would "experience over the course of a year an absentee rate of approximately 12 to 24 absences from the workplace" would not be able to work. (TR at 54.) By failing to address this evidence, the ALJ clearly breached his duty. The case must be remanded so that he can consider these matters.[14]

## V. CONCLUSION

For all the reasons stated, it is ORDERED that the Plaintiff's Motion for Order Reversing Decision of the Commissioner (#16) be, and the same hereby is, ALLOWED, and that Defendant's Motion to Affirm the Commissioner's Decision (#24) be, and the same hereby is, DENIED.

---

[14]
    One of the issues that the ALJ should discuss on remand is whether partial hospitalization programs allow patients to work.

It is FURTHER ORDERED that the decision of the ALJ is VACATED, and the matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

<u>/s/ M. Page Kelley</u>
M. Page Kelley
September 29, 2015                                    United States Magistrate Judge